Patrick Carey, (Bar No. 30862)
Mark Todzo, (Bar No. 168389)
**LEXINGTON LAW GROUP, LLP**
503 Divisadero Street
San Francisco, California 94105
Telephone: (415) 913-7800
pcarey@lexlawgroup.com
mtodzo@lexlawgroup.com

Ian W. Sloss (pro hac vice forthcoming)
Jennifer Sclar (pro hac vice forthcoming)
Johnathan Seredynski (pro hac vice forthcoming)
Krystyna Gancoss (pro hac vice forthcoming)
Kate Sayed (pro hac vice forthcoming)
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
jsclar@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com
ksayed@sgtlaw.com

Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| S.T.G., S.B.G., and S.J.G., minors, by and through their guardian SAMUEL GARCIA, I.H. and E.H., by and through their guardian ARNOLD HERNANDEZ, and M.A and E.V.A, by and through their guardian STEPHANIE ALLEN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> EPIC GAMES, INC. <br><br> Defendant. | Civil Case No.: **'24CV0517 RSH AHG** <br><br> **CLASS ACTION COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiffs S.T.G., S.B.G., and S.J.G., minors, by and through their guardian Samuel Garcia, E.H., and I.H, minors, by and through their guardian Arnold Hernandez, and M.A. and E.V.A., by and through their guardian Stephanie Allen hereby allege the following against Defendant Epic Games, Inc. ("Epic" or "Defendant") on behalf of themselves and all others similarly situated.  Plaintiffs' complaint is based on personal knowledge, information and belief, the investigation of counsel, public sources, and government investigations into Defendant's practices.

## NATURE OF ACTION

1.      This action arises out of the Defendant's unlawful and unfair business practices and invasion of the right to privacy and reasonable expectation of privacy of millions of children under the age of 13.  Plaintiffs bring claims on behalf of themselves and all similarly situated children under the age of 13 who have been injured by Defendant's conduct from July 21, 2017 through February 20, 2023 (the "Class Period") pursuant to the common law right to be free from intrusion upon seclusion recognized by California, Washington, and dozens of other states; pursuant to the California Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200 *et seq.*; pursuant to the right of privacy enumerated in the California Constitution, CAL. CONST. ART. 1, § 1; pursuant to the Washington Consumer Protection Act, WASH. REV. CODE ANN. § 19.86.020, *et seq.*, and for relief from Defendant's unjust enrichment at the expense of minor children.

2.      Defendant Epic is the developer and distributor of Fortnite, a popular video game available to play on multiple consoles, including the Sony PlayStation, Microsoft Xbox, and Nintendo Switch, mobile devices with Android or iOS operating systems, and personal computers with Windows or MacOS operating systems.

3.      Fortnite is famous for its Battle Royale game mode, where up to 100 players compete to be the last player (or team) standing. Fortnite Battle Royale revolves around survival and combat. Players must navigate the map, engage in firefights with weapons, and strategically use their resources

to outlast the other players. Although additional Fortnite game modes exist, Battle Royale remains its most popular by far.

4.      Although technically rated for teenagers, Epic purposefully designed the look and feel of Fortnite to appeal to younger children. For example, Fortnite features bright, colorful graphics with a cartoonish style, and while the game includes a variety of weapons like shotguns, assault rifles, sniper rifles, the game does not depict blood or gore. Instead, when characters are defeated in battle, they are teleported away rather than being graphically harmed. Additionally, Epic has added creative building elements to Fortnite to attract younger players. Players can construct various structures, which adds a playful, imaginative element to the game that can be particularly engaging for children. Finally, Fortnite offers young children the chance to interact with friends online, making it appealing to young children with want to play with classmates, friends, or siblings.

5.      Indeed, When Fortnite was introduced in 2017, Epic stated that the experience of fort-building with blankets and cushions at home or in the woods near your house, was the "soul of Fortnite."[1]

6.      As detailed more fully below, Epic had actual knowledge that a substantial proportion of its user base was (and continues to be) made up of children under the age of 13.

7.      Although Fortnite is free to download, Epic generates billions of dollars in revenue through the sale of in-game purchases, and advertising and merchandising contracts.  Fortnite's revenue streams each depend upon the exploitation of children and their Personal Information.

8.      The Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 501, *et seq.,* protects children under 13 years of age from having their personal information ("Personal Information") collected, unless their parent has first given verifiable consent.

---

[1] See Darren Sugg, *Build, Explore, Craft and Fight on July* 25, EpicGames.com (June 8, 2017), https://www.fortnite.com/news/build-explore-craft-and-fight-on-july-25

CLASS ACTION COMPLAINT

9.     Since 2013, persistent identifiers (such as cookies that track a child's activity online, geolocation information, photos, videos and audio recordings), have been included within the definition of "Personal Information" that operators of websites and online services are barred by COPPA from collecting from children under 13 without parental consent.

10.     California, Washington and 32 other states provide their citizens with substantial protections against unwarranted invasions of privacy by recognizing the common law right to be free from intrusion upon seclusion, as formulated by § 652B of the Restatement (Second) of Torts, which prohibits intentional intrusion upon the solitude or seclusion of another or his or her private affairs or concerns.

11.     Epic routinely collects personal information, including but not limited to name, screen name, persistent identifiers, geolocation and biometric data, in order to facilitate in-game purchases, target advertising, and sell merchandise.

12.     During the Class Period, Epic used children's Personal Information to track the activity of children under the age of 13 playing Fortnite and exploited it for commercial purposes, including but not limit to: (1) using children's Personal Information to develop merchandise and other products such as clothing targeting children under 13; (2) using children's Personal Information to develop and promote thematic in-game items made available to purchase such as skins (or costumes), dance moves, and other modifications that were routinely offered to children in order to enhance play; and (3) using children's Personal Information to serve those children with targeted, behavior-based advertising, including in-game product placements – the most insidious kind of advertising. This behavior generated tens of millions, if not hundreds of millions of dollars (or more) in revenue for Defendant Epic.

13.     In addition to exploiting children for financial gain, during interactive play, Fortnite matched children with strangers and permitted them to chat via voice and text without parental notice or consent. Because Fortnite's default setting permitted real-time communication via voice and text chat,

and players' account names were publicly broadcast to other players, Defendant, through Fortnite, facilitated dangerous interactions that exposed children to bullying, threats, and harassment, including sexual harassment.

14.     Epic's violation of COPPA via the collection of Personal Information without obtaining adequate (or any) parental consent and the exposure of children to dangerous interactions with unknown adults caused Epic Games to enter into a Permanent Injunction with the United States of America on December 22, 2022.  The FTC Complaint against Epic charged:

> [T]hat [Epic] violated the COPPA Rule and the FTC Act by developing and operating an Internet-enabled video game with unfair default information sharing settings for Children and Teens; by failing to provide notice on [Epic's] website or online service, and direct notice to Parents, of the Personal Information [Epic] Collects online from Children, how [Epic] uses such information, and [Epic's] Disclosure practices; by failing to Obtain Verifiable Parental Consent before any Collection or use of Personal Information from Children; by failing to provide, at the request of Parents, a description of the specific types or categories of Personal Information Collected from Children; and by failing to delete, at the request of Parents, Personal Information Collected from Children.

15.     The Injunction prevents Epic from collecting data from children under the age of 13 without verifiable parental notice and consent, mandates privacy default settings, mandates the deletion of information previously collected, imposes reporting and assessment requirements with respect to its COPPA compliance, and imposed a civil penalty of $275 million for its COPPA violations.

16.     Separately, the FTC entered an Order requiring Epic to pay $245 million to settle claims that it "deployed a variety of design tricks known as dark patterns aimed at getting consumers of all ages to make unintended in-game purchase."[2]  Under the Order, Epic paid $245 million to refund customers who purchased unwanted items with in-game currency, and/or who purchased items without parental

---

[2] https://www.ftc.gov/news-events/news/press-releases/2023/03/ftc-finalizes-order-requiring-fortnite-maker-epic-games-pay-245-million-tricking-users-making (Accessed on March 12, 2024).

CLASS ACTION COMPLAINT

authorization.  The FTC sent out millions of notices to Fortnite Gamers to inform them of the settlement fund.  Consumers were able to apply for refunds through the FTC website until February 29, 2024.[3]

17.    The settlement fund did not compensate children for the unlawful collection and use of their Personal Information for the purpose of targeting them with behavioral advertising and merchandising partnerships.

18.    Plaintiffs bring this case individually and on behalf of all other similarly situated children who have suffered a violation of their reasonable expectation of privacy as a result of Epic's unlawful conduct in collecting and using the Personal Information of children without verifiable parental notice and consent in violation of COPPA, common law, and state unfair and deceptive trade practices.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the amount in controversy for the Class exceeds $5,000,000 exclusive of interest and costs, there are more than 100 putative members defined below, and minimal diversity exists because the majority of putative class members are citizens of a state different from Defendant's.

20.    This Court also has jurisdiction pursuant to 28 U.S.C. §1332(d), because the amount in controversy exceeds $75,000 and is between citizens of different states.

21.    This Court has specific personal jurisdiction over Defendant Epic Games, Inc., because it purposefully directs its conduct toward California, transacts business in this District and in California, engages in conduct that has had and continues to have a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons throughout the United States, including those in this District and in California, purposely availed themselves of the laws of California, and these actions gave rise to Plaintiffs' claims in California.

---

[3] https://www.ftc.gov/enforcement/refunds/fortnite-refunds  (Accessed on March 12, 2024).

22.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial portion of the conduct described in this Complaint was carried out in this District.

## PARTIES

23.     Plaintiff S.T.G. is a natural person and is domiciled in San Diego, California.  S.T.G. is a minor and was under the age of 13 during the Class Period.

24.     Plaintiff S.B.G. is a natural person and is domiciled in San Diego, California.  S.B.G. is a minor and was under the age of 13 during the Class Period.

25.     Plaintiff S.J.G. is a natural person and is domiciled in San Diego, California. S.J.G. is a minor and was under the age of 13 during the Class Period.

26.     Proposed *Guardian Ad Litem* Samuel Garcia is the legal guardian of S.T.G., S.B.G., and S.J.G and is domiciled in San Diego, California.

27.     Plaintiff I.H. is a natural person and is domiciled in Buellton, California.   I.H. is a minor and was under the age of 13 during the Class Period.

28.     Plaintiff E.H. is a natural person and is domiciled in Buellton, California.   E.H. is a minor and was under the age of 13 during the Class Period.

29.     Proposed *Guardian Ad Litem* Arnold Hernandez is the legal guardian of I.H. and E.H. and is domiciled in Buellton, California.

30.     Plaintiff M.A. is a natural person and is domiciled in Onalaska, Washington.  M.A. is a minor and was under the age of 13 during the Class Period.

31.     Plaintiff E.V.A. is a natural person and is domiciled in Onalaska, Washington.  E.V.A. is a minor and was under the age of 13 during the Class Period.

32.     Proposed *Guardian Ad Litem* Stephanie Allen is the legal guardian of M.A. and E.V.A and is domiciled in Onalaska, Washington.

33. Defendant Epic Games, Inc. is a Maryland corporation with its principal place of business at 620 Crossroads Blvd., Cary, North Carolina 27518. At all times relevant to this Complaint, acting alone or in concert with others, Epic has advertised, marketed, distributed, or sold the video game Fortnite and in-game Fortnite content to consumers throughout the United States.

## I.   FORTNITE

34. Fortnite is a survival game in which individuals or teams fight to be the last person or team standing. Fortnite has three "modes" of play; Battle Royale, Save the World and Creative. Battle Royale and Save the World, by far the most popular modes, are free to download.

35. Fortnite can be played on many different game consoles including Sony PlayStation, Microsoft Xbox, Nintendo Switch, mobile devices running Android or iOS operating systems, and PC's running Microsoft Windows, or Apple computers running MacOS. Players can compete with each other across different game consoles.

36. In Fortnite Battle Royale, up to 100 players, playing solo or in small groups, are airdropped from a "Battle Bus," that looks like a blue school bus. Players have to scavenge for weapons and resources to stay alive, while working to attack other players and "eliminate" them from the game. Players also have to build safe structures and try to avoid the Storm that damages all players outside the safe zone. Players may be eliminated by failing to quickly evacuate as the area of the map shrinks throughout the game. The more the map shrinks, the more players are forced into encounters. The last player, duo, or team to survive, wins the game.

37. Although Fortnite is free to download, Fortnite has and continues to generate billions of dollars for Epic. Fortnite makes money through targeted advertising, in-game advertising partnerships, merchandising partnerships and in-game purchases.

38. Players can be individualized and enhanced through the purchase of cosmetics, such as new outfits, pickaxes, backpacks, gliders and more using Fortnite's in-game currency, called

Vinderbucks or V-Bucks.  One U.S. dollar equals 100 V-Bucks.  Players can also purchase a Battle Pass with V-Bucks.  A Battle Pass comes with a swath of new characters, and as a player continues, he or she is able to unlock new cosmetics for those characters.

39.     In addition to these in-game purchases, which was the subject of Epic's $245 million settlement to reimburse consumers, Epic makes money through targeted advertising and merchandising partnerships with popular franchises such as Marvel, Mandalorian, Predator, and Tron.  These partnerships frequently cause new characters and costumes to be introduced that are particularly appealing to children.  Thus, although the game is free to download, the quality of the experience is dependent on how much a player is willing to spend.  Maximizing the amount that players spend on in-game purchases and on Fortnite branded merchandise is what drives Fortnite's design.

40.     Fortnite generates ad revenue by running in-game ads, pre-game ads, and permitting brands to sponsor individual players and create branded events and live experiences.   For instance, Fortnite has featured live in-game concerts of acts that are popular with children such as Marshmello, Travis Scott, Ariana Grande, and BTS.

41.     In-game ads allow brands to place ads within the game world, so the ads are actually part of the environment. This creates a seamless integration between the gaming experience and the ad.  Pre-game ads, which appear before a match starts, are more traditional, static ads.[4]

42.     Fortnite has been wildly profitable for Epic.  Total revenue for Fortnite between 2018 and 2021 was over $20 billion.  Fortnite has approximately 400 million registered players, 83 million of whom play once a month. Battle Royale remains the overwhelming favorite mode of play and continues to be a financial juggernaut for Epic.

---

[4] https://fox59.com/business/press-releases/ein-presswire/610255938/jose-eshkenazi-smeke-how-fortnite-ads-work-and-how-to-become-a-bigger-brand-through-video-game-advertising/ (Accessed 3-12-24).

## II.      THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

43.      Congress passed the Children's Online Privacy Protection Act ("COPPA"), codified at 15 U.S.C. § 6501, *et seq*., in 1998 in response to concerns that children's online activities were being tracked by operators of websites and online services. COPPA is intended to "maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."  COPPA's standards have given rise to, and correlate with, accepted norms throughout society for defining the expectations of privacy for minor children.

44.      COPPA applies to any operator of a commercial website or online service directed to children under 13 years of age that collects, uses, and/or discloses Personal Information from children and provides in pertinent part, that:

> It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission]. 15 U.S.C. § 6502(a).

45.      COPPA requires operators of child-directed websites or online services to meet specific requirements prior to collecting, using, or disclosing children's personal information online, including but not limited to:

A.      Posting a privacy policy on its website or online service providing clear, understandable, and complete notice of its information practices, including what information the operator collects from children online, how it uses such information, its disclosure practices for such information, and other specific disclosures set forth in the Rule;

B.      Providing clear, understandable, and complete notice of its information practices, including specific disclosures, directly to parents;

C.    Obtaining verifiable parental consent prior to collecting, using, and/or disclosing personal information from children;

D.    Providing a reasonable means for parents to review personal information collected from children online, at a parent's request; and

E.    Deleting personal information collected from children online, at a parent's request.

46.    In order to determine whether a website or online service is "directed to children" the FTC will:

> [C]onsider [the website's or online service's] subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. 16 CFR § 312. (hereinafter the "COPPA Factors")

47.    In 2013, COPPA was enhanced (the "2013 COPPA Enhancement") to provide further protection for children against online tracking and to "giv[e] parents greater control over the online collection of their children's personal information." The 2013 enhancement widened the definition of children's "Personal Information" to include "persistent identifiers" such as cookies that track a child's activity online, geolocation information, photos, videos, and audio recordings.

48.    The 2013 COPPA Enhancement was the culmination of two years of rulemaking by the FTC and reflected society's growing recognition of the surreptitious surveillance tactics used by advertising companies to track children online and advertise to them while using the internet.

49.    For example, the FTC published a 2012 report entitled Mobile Apps for Kids: Disclosures Still Not Making the Grade (the "FTC Kids Mobile App Report") addressing privacy dangers for children using mobile devices with persistent identifiers to access the internet. The FTC Kids Mobile App Report warned that companies link persistent identifiers and geolocation data they collect with additional Personal Information such as name, address, and email address—allowing those

entities and their advertising partners to identify individual users whom they profile with indisputably individual specificity.

50.     By expressly including persistent identifiers and geolocation data in COPPA's definition of Personal Information, the FTC intended to deter advertising companies and advertising network operators from exploiting young children via tracking, profiling, and advertising online.

51.     Pursuant to Section 1303(c) of COPPA, 15 U.S.C. § 6502(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of COPPA constitutes an unfair … act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

52.     While COPPA does not itself provide a private right of action for individuals to seek redress for harms arising from COPPA violations, and contains a limited preemption clause barring the imposition of liability by states and local governments "inconsistent" with COPPA (15 U.S.C. § 6502(d)), the United States Court of Appeals for the Ninth Circuit has held that "COPPA's preemption clause does not bar state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." *Jones v. Google LLC*, 73 F.4th 636 (9th Cir. 2023).

53.     Therefore, individuals harmed by conduct which violates COPPA such as the conduct described herein may seek redress for harms via state law causes of action.

## III.     FORTNITE IS "DIRECTED TO CHILDREN UNDER THIRTEEN" AS DEFINED BY COPPA, AND EPIC HAD ACTUAL KNOWLEDGE OF IT

54.     Application of the COPPA Factors to Fortnite, including the game's subject matter, use of animation, child-oriented activities and language, and music content, evidence of intended audience, and empirical evidence about the game's player demographics, leads to the unmistakable conclusion that Fortnite is directed to children under age thirteen.

55.     Epic designed Fortnite to feature cartoonish and colorful avatars and graphics resembling superhero cartoons designed to be attractive to young children. Additionally, unlike similar shooter

games that are geared toward older audiences, Fortnite is bloodless. That is, players are not "killed," they are instead transported off the playing grid.

56.     Epic also developed and incorporated features into Fortnite which mirror features of other games popular with children under 13 with the specific intent of attracting those other games' players. For example, Epic incorporated building and crafting features and additional playing modes beyond Battle Royale into Fortnite which strongly resemble prominent features of Microsoft's Minecraft game, to appeal to young children's creativity.

57.     Empirical evidence shows that many children play Fortnite, which is disproportionately popular with "tweens." For example, publicly available survey results from a 2019 report show that 53% of U.S. children aged 10-12 played Fortnite weekly, compared to 33% of U.S. teens aged 13-17, and 19% of the U.S. population aged 18-24.3 And Epic, which had previously contracted with the company that conducted this survey (to conduct a different survey in connection with Fortnite), received pre-publication copies of the survey results along with a private briefing by the researchers who conducted the survey.

58.     Results from Epic's own player surveys are consistent with this data. While Epic avoided collecting Fortnite players' precise ages, Epic has consistently asked about players' living situation and occupation through player surveys—and used the results as a proxy for players' age demographics. The results show that most Fortnite players (i.e., approximately 70%) live at home with their parents or guardians, and, of those who live with their parents or guardians, most (i.e., approximately 80%) identify as students. And when soliciting potential brand partnerships for Fortnite, Epic has used social media data to emphasize Fortnite's popularity among young gamers—noting that a third of Fortnite players, based on social media data, are teens aged 13-17 (i.e., the youngest age demographic available in the social media data, which cuts off at age 13).

59.     Epic knows that children play Fortnite. Epic employees and player support agents review and respond to thousands of player-related requests, reports, and complaints that come in each day, many of which identify specific Fortnite players as being children under 13.

60.     Epic and its employees also regularly monitor, read, and circulate news articles and social media posts chronicling Fortnite's popularity among children, and sometimes incorporate kids' ideas directly into the game. For example, the concept behind a popular "cosmetic" (i.e., outfit for players' in-game avatars) in Fortnite, called "Tender Defender," originated in the mind of an eight-year-old Fortnite player whose father had shared his son's idea on the social media site Reddit.com, where it caught the attention of Epic's Fortnite development team.

61.     Epic, too, has sent Fortnite "swag"—i.e., Fortnite-branded merchandise— intended for children under 13, including in response to celebrities' swag requests for their "Fortnite obsessed" children. And to help Epic evaluate potential new features, the former Game Director for Fortnite would bring his son, who was under 13 years old, to participate in internal company playtests of Fortnite.

62.     Further, when Epic lobbied Microsoft and Sony to support cross-console gameplay, allowing, e.g., Xbox Fortnite users to play with PlayStation Fortnite users, Epic stressed the feature's impact on kids, noting for example that "many Fortnite players are kids" and that cross-console gameplay would "bring together current and potential gamers in real-world social groups: college dorms, high school classes, even kids . . ."

63.     Epic's records include other acknowledgements, too. In numerous internal communications, Epic employees have reported being inundated with Fortnite questions and requests during in-person conversations with players under 13, watching kids perform Fortnite dances in public, and receiving notes from teachers about Fortnite's popularity with their middle and elementary school students. In other ordinary course business communications, Epic employees have noted that "a large portion of our player base" consists of "underage kids," acknowledged Fortnite's "high penetration

CLASS ACTION COMPLAINT

among tweens/teens," flagged "that Fortnite is enjoyed by a very young audience at home and abroad," and described putting on Fortnite "dance cam," "makeup booth (for kids)," and other events at public gaming conferences (where most attendees were "very young")— including events where "[t]he idea was that any kid or teenager playing could feel like a pro."

64.     Other evidence reviewed by the FTC shows Epic employees acknowledging that their own family members under 13 were playing Fortnite. For example, one Fortnite programmer lamented:

> So when I was at my brother's house, and was watching my 10 yr old nephew play. I'm like, hey, why is there no sound on the TV? And he's like, we turn off the volume because you can hear people talking. People related to me by blood were no sh[**] muting the TV instead of looking for a way to disable voice chat. Not a proud day . . . The settings are not a land most folks venture to, certainly not technophobic parents . . .

65.     In another example, an Epic employee stated that "Agree with the idea that, generally, all theming should be relevant to a 8-14 year-old, as a litmus test."

66.     Epic entered into lucrative partnerships with several companies to create consumer goods, toys, and clothing directed at children under 13, a business decision that only makes sense if the partnerships were geared toward a target audience. These partnerships included partnerships to create Fortnite-branded costumes, toys, books, youth-sized apparel, and "back to school" merchandise (e.g., backpacks, pencil cases, etc.).

67.     For example, Epic partnered with Spirit Halloween to offer officially licensed Fortnite Halloween costumes. Available in children's sizes, these costumes have been very popular with kids and spawned articles with headlines like "Excited Kids Are Baffling Adults With Their Fortnite Halloween Fervor." Indeed, Spirit Halloween sold hundreds of thousands of child-sized Fortnite costumes between 2018 and 2020, which account for more than half of all Fortnite costumes sold by Spirit Halloween during those years.

68.     As another example, Epic partnered with Hasbro to sell Fortnite-branded Nerf toys targeting children, including Nerf guns and Super Soaker water guns, among others. Consistent with the

core demographic for Hasbro's Nerf products, the "Fortnite X Nerf" product line launched in early 2019 using a "#FortniteIRL [In Real Life]" tagline with paid advertisements in media channels targeting "6-11 year old boys." As of December 2022, Epic and Hasbro were offering more than 40 different officially licensed Fortnite toys on Hasbro's website, including three Super Soaker products for "Kids: 69," and 33 different Nerf, Super Soaker, and other toys for "Tweens: 8-12" (as reflected in the screenshot below).



69.      Epic also partnered with Jazwares and Moose Toys to produce official Fortnite action figures, playsets, and other toys. As with the Epic-Hasbro partnership, toys from the Epic-Jazwares and Epic-Moose Toys partnerships were marketed to and for kids, including through television commercials targeting those aged 12-17 that aired on the Cartoon Network, Nickelodeon, and Nicktoons (Epic-Jazwares), and video advertisements on YouTube and Twitch intended to reach "Fortnite fans 8-12" and "Fortnite fans 13-21" (Epic-Moose Toys). And toys from all three partnerships were marketed through

seasonal toy catalogs from retailers like Amazon, Target, and Walmart (including the 2019 Walmart toy catalog excerpted below).



70.     It is, and always was, readily apparent that these toys were intended for children under 13. Notably, a toy from the Epic-Jazwares partnership—the Fortnite Llama Loot Pinata—tied with Lego's Harry Potter products to win the "Toys / Games / Novelties for Ages 0-12" category at the 2019 International Licensing Awards. As the head of Epic's consumer products program explained internally, Epic won the "Newcomer" award that year after Fortnite or Fortnite-branded products won first place awards in five categories—despite being "up against some heavy hitters like Harry Potter, Jurassic World, and Lego."

71.     Epic was not a passive participant in licensing deals.  Rather, Epic was heavily involved in each licensing deal, retaining approval power over product design, packaging, marketing and advertising plans.

72.     By the first half of 2020, Epic's consumer products program had generated more than $1 billion in gross sales of Fortnite-branded merchandise, bringing more than $130 million in gross royalties to Epic and its licensing agent. Most of this success was driven by the popularity of Epic's

official Fortnite toys, which accounted for nearly 70% (~$650 million) of all Fortnite-branded merchandise sales, and more than 60% (~$80 million) of the royalties from such sales, through the first quarter of 2020.  Clearly, Epic had actual knowledge that a key demographic for Fortnite was children under the age of 13.

## IV.   FORTNITE COLLECTED PERSONAL INFORMATION FROM ALL PLAYERS, INCLUDING THOSE UNDER 13.

73.   Despite knowing that children under 13 were playing Fortnite, Epic collected Personal Information from *all* Fortnite players, including those under 13.

74.    To play Fortnite using a personal computer or mobile device, players must first create an Epic Games account. Prior to September 2019, anyone could create an Epic Games account by providing Epic Games with their first name, last name, and email address, and choosing a name (called a "display name") for their account. This remains the process for players located outside the United States and Europe. For players in the United States or Europe, however, Epic began requiring birthdate information as part of the account creation process on September 11, 2019 (for U.S. players), September 2, 2021 (for U.K. players), and November 30, 2021 (for European players outside the U.K.).

75.   To play Fortnite on a PlayStation, Xbox, or Switch console, players can choose to create an Epic Games account, register their console to an already-created Epic Games account, or access Fortnite using what Epic refers to as a "nameless" account. If a player chooses this last option to play Fortnite on their PlayStation, Xbox, or Switch console, Epic creates a "nameless" Epic Games account for that player on Epic's backend automatically—generating a unique account ID for the player, associating that unique account ID to the player's PlayStation, Xbox, or Switch console, and collecting the player's PlayStation, Xbox, or Switch account name for use as the player's display name within Fortnite.

76.   Regardless of the console or type of account a player uses, several social features are enabled within Fortnite by default that convert the game into a platform for connecting with other

players. Among other things, these social features allow players to find and friend each other (by display name), play matches together, exchange personal information, and converse with each other in real time by voice and text.

77.     On the backend, Epic collects and uses various unique device IDs, account IDs, and other persistent identifiers to keep track of players' progress, purchases, settings, and friends lists, among other player-specific information. The identifiers Epic collects include device IP addresses, device ID numbers, software identifiers, and other persistent identifiers.

78.     Epic uses these identifiers to track players while they play Fortnite, including the specific game type played, when, for how long, game progress, and the name or other user IDs provided in connection with sign up.

79.     Epic profits from the Personal Information collected in a number of ways, including pairing this player-specific information with additional personal information Epic collects about Fortnite players outside of gameplay, including information on player interactions with Epic's website, and games "including the URLs of referring and exiting pages, page views, time spent on a page, number of clicks and platform type."

80.     Epic shares this information with advertisers and other marketing partners for purposes of gauging the effectiveness of advertising and other marketing and merchandising strategies, and Epic itself uses this information, together with additional information collected by Epic and information collected from third-party sites, including social networking sites, to manage and customize advertisements or promotional offers.

**V.    EPIC'S TRACKING, PROFILING, TARGETING AND EXPLOITATION OF CHILDREN WITHOUT PARENTAL CONSENT VIOLATED PLAINTIFFS' AND CLASS MEMBERS' REASONABLE EXPECTATIONS OF PRIVACY AND IS HIGHLY OFFENSIVE.**

81.     Epic's violation of the privacy rights and reasonable expectations of privacy of Plaintiffs and Class Members is particularly egregious because Epic violated laws designed to protect a group – children – that society has long recognized as vulnerable to exploitation and manipulation.

82.     Children are more susceptible to being victimized and exploited by unlawful, unfair, or deceptive conduct than adults and, accordingly, society has recognized the importance of providing added legal protections for children, often in the form of parental consent requirements like COPPA.

83.     In fact, as discussed above, the FTC's enhancements of COPPA in 2013 reflect the specific concern with mobile app tracking and tracking internet users via persistent identifiers and reflect the offensiveness with which society regards this behavior.

84.     Children develop the ability to use smartphones and tablets by the age of two.[5] Almost every family with a child younger than eight in America has a smartphone (95%) and/or tablet (78%) in the household.[6]

85.     Often, children are given their own devices, with one 2015 study finding that by age four, 75% of children had their own tablet, smartphone, or iPod.[7]

---

[5] Elyse Wanshel, *10 Reason Why You Shouldn't Give a Child a Smartphone or Tablet*, LITTLE THINGS, https://www.littlethings.com/reasons-not-to-give-children-technology (accessed Oct. 21, 2019).

[6] Victoria Rideout, *The Common Sense Census: Media Use By Kids Age Zero To Eight*, COMMON SENSE MEDIA (2017) at 3, https://www.commonsensemedia.org/research/the-common-sense-census-media-use-by-kids-agezero-to-eight-2017 (accessed Oct. 21, 2019).

[7] *The Dangers of YouTube for Kids*, THE ATLANTIC (Nov. 2018), https://www.theatlantic.com/magazine/archive/2018/11/raised-by-youtube/570838/ (accessed Oct. 22, 2019) ("[A] team of pediatricians at Einstein Medical Center, in Philadelphia, found that YouTube was popular among device-using children under the age of 2. Oh, and 97 percent of the kids in the study had used a mobile device. By age 4, 75 percent of the children in the study had their own tablet, smartphone, or iPod. And that was in 2015.).

86.     Nearly all parents in the United States (94%) say their children under 13 use online apps, with top apps used being video streaming (64%), video gaming (58%) and show/movie streaming (58%).[8]

87.     Four in five parents (80%) whose children under 13 use online apps say they worry about their children's privacy when using those apps,[9] with the top concern (69%) being data tracking.[10]

88.     Nearly 3 in 4 parents whose children under 13 use online apps (73%) say they are concerned about their children's location being tracked by those apps; those residing in urban or rural areas are more likely than those residing in suburban areas to share this sentiment (88% and 87% vs. 73%).[11]

89.     More than three-quarters (77%) of parents are concerned about protecting their family's digital privacy.[12]

90.     73% of parents are concerned about personal data being collected by third parties, without their consent.[13]

91.     And parents also recognize the importance of protecting their children's identity (90%), location (88%), health data (87%), age (85%), school records (85%), and browsing history (84%).[14]

92.     Additionally, a survey conducted by the Center for Digital Democracy ("CDD") and Common Sense Media of more than 2,000 adults found overwhelming support for the basic principles of

---

[8] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

[9] Id.

[10] https://www.cdpinstitute.org/news/childrens-privacy-data-tracking-is-a-big-concern-for-parents-and-trust-levels-in-companies-are-low/.

[11] https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap.

[12] https://trustedfuture.org/childrens-digital-privacy-and-safety.

[13] Id.

[14] Id.

CLASS ACTION COMPLAINT

privacy embedded in the California Constitution, state common law, as well as federal law. For example:

A.   75% of parents surveyed by CDD **strongly disagreed** with the proposition that "it is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content."

B.   69% of parents surveyed by CDD **strongly disagreed** with the proposition that "as long as advertisers don't know a child's name and address, it is okay for them to collect and use information about the child's activity online."

C.   84% of parents surveyed by CDD **strongly disagreed** with the proposition that "[I]t is okay for advertisers to collect information about a child's location from that child's mobile phone."

D.   89% of parents surveyed by CDD **strongly agreed** with the proposition that "[b]efore advertisers put tracking software on a child's computer, advertisers should receive the parent's permission."

E.   93% said *it was a good idea* to have a federal law "that says that online sites and companies need to ask parents' permission before they collect Personal Information from children under age 13."

93.   Despite parents' feelings and society's attitude towards this behavior, Epic collected the personal information of children under 13 without parental consent so Epic could earn advertising and merchandising revenue.

94.   By failing to (1) obtain verifiable parental consent, (2) disclose to parents the nature of their data collection practices, and (3) take other steps to preclude the capture of children's Personal Information, Defendant has breached the privacy rights and reasonable expectations of privacy of S.B.G., S.T.G., S.J.G. and the other millions of minors who have played Fortnite, in contravention of

privacy norms that re reflected in consumer surveys, centuries of common law, state and federal statutes, legislative commentaries, industry standards and guidelines, and scholarly literature.

## MINORITY TOLLING

95.　All claims asserted on behalf of S.B.G., S.T.G., S.J.G are tolled by Cal. Civ. Proc. Code § 352.

96.　All claims asserted on behalf of I.H. and E.H. are tolled by Cal. Civ. Proc. Code § 352.

97.　All claims asserted on behalf of M.A. and E.V.A. are told by Wash. Rev. Code Ann. § 4.16.190.

## CLASS ACTION ALLEGATIONS

98.　Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

99.　Plaintiffs S.B.G., S.T.G, S.J.G., I.H, E.H., M.A., and E.V.A seek class certification of claims for the common law privacy cause of action of "Intrusion Upon Seclusion," on behalf of a class defined as follows:

> **The Intrusion Upon Seclusion Class:** all persons residing in the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Dakota, Texas, Utah, Vermont, Washington, and West Virginia who are younger than the age of 13, or were younger than the age of 13 when they created an Epic account (either directly or through a third-party such as Google, Facebook or Microsoft) and played any version of Fortnite, and from whom Epic collected, used, or disclosed Personal Information without first obtaining verified parental consent.

100.　Plaintiffs S.B.G., S.T.G, S.J.G., I.H, and E.H., seek class certification of claims for violations of the State of California Constitution Right to Privacy, the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.,* and for unjust enrichment on behalf of a class of California residents defined as follows:

> **The California Class**: all persons residing in California who are younger than the age of 13, or were younger than the age of 13 when they created an Epic account (either directly or through a third-party such as Google, Facebook or Microsoft) and played any version of Fortnite, and from whom Epic collected, used, or disclosed Personal Information without first obtaining verified parental consent.

101. Plaintiffs M.A. and E.V.A., by and through guardian Stephanie Allen, seek class certification of claims for violations of the Washington Consumer Protection Act, Wash. Rev. Code Ann. § 19.86.020, *et seq.*, and for unjust enrichment on behalf of a class of Washington residents defined as follows:

> **The Washington Class:** all persons residing in Washington who are younger than the age of 13, or were younger than the age of 13 when they created an Epic account (either directly or through a third-party such as Google, Facebook or Microsoft) and played any version of Fortnite, and from whom Epic collected, used, or disclosed Personal Information without first obtaining verified parental consent.

102. Plaintiffs reserve the right to modify or refine the Class definitions based upon discovery of new information and in order to accommodate any of the Court's manageability concerns.

103. **Ascertainability.** The proposed Classes are readily ascertainable because they are defined using objective criteria so as to allow class members to determine if they are part of a Class. Further, the Classes can be readily identified through records maintained by Defendant.

104. **Numerosity (Rule 23(a)(1)).** The Classes are so numerous that joinder of individual members herein is impracticable. The exact number of Class members, as herein identified and described is not known, but based on the number of times Fortnite has been downloaded and played, Epic has collected information on millions of children.

105. **Commonality (Rule 23(a)(2)).** Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including the following:

    A. Whether Defendant collected the Personal Information of children under 13;

B.  Whether Defendant had knowledge it was collecting the Personal Information of children under the age of 13;

C.  Whether Defendant obtained verifiable parental consent to collect the Personal Information of children under the age of 13;

D.  Whether the collection of Personal Information of children under the age of 13 is highly offensive to a reasonable person;

E.  Whether the collection of Personal Information of children under the age of 13 without parental consent is sufficiently serious and unwarranted as to constitute an egregious breach of social norms;

F.  Whether Defendant's conduct violated COPPA;

G.  Whether Defendant's conduct constituted an invasion of privacy based on California's and Washington's common law protection against intrusion upon seclusion;

H.  Whether Defendant's conduct constitutes a violation of the California Constitution right to privacy;

I.  Whether Defendant's conduct was unlawful or deceptive;

J.  Whether Defendant's conduct violated the California Unfair Competition Law;

K.  Whether Defendant's conduct violated the Washington Consumer Protection Act;

L.  Whether Plaintiffs and members of the Classes are entitled to monetary damages and the measure of those damages;

M.  Whether Plaintiffs and members of the Classes are entitled to restitution, disgorgement and/or other equitable and injunctive relief;

N.  Whether Defendant was unjustly enriched by its conduct;

O.  Whether Defendant fraudulently concealed its conduct; and

P.      Whether Plaintiffs and members of the Classes are entitled to injunctive and equitable relief.

106.    **Typicality (Rule 23(a)(3)).**  Plaintiffs' claims are typical of the claims of the other members of the proposed Classes.  Plaintiff and members of the Classes suffered an invasion of privacy as a result of Defendant's wrongful conduct that is uniform across the Classes.

107.    **Adequacy (Rule 23(a)(4)).**  Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel competent and experienced in complex litigation and class actions.  Plaintiffs have no interest that is antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiffs.  Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so.  Neither Plaintiffs nor Plaintiffs' counsel has any interest adverse to those of the other members of the Classes.

108.    **Substantial Benefits.**  This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Classes is impracticable.  The prosecution of separate actions by individual members of the Classes would impose heavy burdens upon the Courts, would create a risk of inconsistent or adjudication of the questions of law and fact common to members of the Classes, and would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.  This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.  Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

109.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

## CLAIMS FOR RELIEF

### CLAIM ONE
### INTRUSION UPON SECLUSION

**(On Behalf of Plaintiffs and the Intrusion Upon Seclusion Class)**

110.    The foregoing allegations are re-alleged as if fully set forth herein.

111.    Plaintiffs S.B.G., S.T.G., S.J.G., I.H., E.H., M.A, and E.V.A. and all members of the Intrusion Upon Seclusion Class have reasonable expectations of privacy in their online behavior, as reflected by societal norms, attitudes towards privacy, and the societal concerns underpinning COPPA. Plaintiffs' and members of the Intrusion Upon Seclusion Class's private affairs include their behavior on their devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendant Epic.

112.    Defendant Epic intentionally intruded on and into Plaintiffs' and members of the Intrusion Upon Seclusion Class's solitude, seclusion, or private affairs by intentionally and surreptitiously obtaining, improperly gaining knowledge of, reviewing and/or retaining Plaintiffs' and members of the Intrusion Upon Seclusion Class's activities through the monitoring and tracking activities described herein.

113.    These intrusions are highly offensive to a reasonable person.  This is evidenced by, *inter alia,* countless consumer surveys, academic and governmental studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations, legislative commentaries, enforcement actions undertaken by the FTC and Attorney General of the United States, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

CLASS ACTION COMPLAINT

114.    Defendant Epic's intrusion into the sacrosanct relationship between parent and child and subsequent commercial exploitation of children's special vulnerabilities online also contributes to the highly offensive nature of Defendant's activities.

115.    Plaintiffs and members of the Intrusion Upon Seclusion Class were harmed by the intrusion into their private affairs as detailed throughout this Complaint.  Defendant Epic's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and members of the Intrusion Upon Seclusion Class.

116.    Plaintiffs and members of the Intrusion Upon Seclusion Class seek (1) injunctive relief, to the extent that the Permanent Injunction entered into between Defendant Epic and the United States of America does not provide complete injunctive relief for the practices complained of herein, in the form of orders compelling Defendant Epic's cessation of tracking and targeting practices in violation of state law and destruction of all personal data obtained in violation of state law; (2) compensatory and punitive damages in an amount to be determined at trial.  Plaintiffs and members of the Intrusion Upon Seclusion Class seek punitive damages because Defendant Epic's actions – which were malicious, oppressive, and willful – were calculated to injure Plaintiff and were made in conscious disregard of Plaintiff's rights. Punitive damages are warranted to deter Defendant Epic from engaging in future misconduct.

## CLAIM TWO

### CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code § 17200

### (On Behalf of Plaintiffs S.T.G., S.B.G., I.H., E.H., and the California Class)

117.    The foregoing allegations are re-alleged as if fully set forth herein.

118.    Defendant engaged in business acts and practices deemed "unlawful" under the UCL, because, as alleged above, Defendant unlawfully tracked, targeted, and profiled Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class without obtaining parental consent in violation of COPPA and Federal Trade Commission regulations.

119.    Defendant also engaged in business acts or practices deemed "unfair" under the UCL because, as alleged above, Defendant failed to disclose during the Class Period that Defendant was tracking, profiling, and targeting Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class children through the collection of Personal Information.  Unfair acts under the UCL have been interpreted using three different tests: (1) whether the public policy which is a predicate to a consumer unfair competition action under the unfair prong of the UCL is tethered to specific constitutional, statutory, or regulatory provisions; (2) whether the gravity of the harm to the consumer caused by the challenged business practice outweighs the utility of the defendant's conduct; and (3) whether the consumer injury is substantial, not outweighed by any countervailing benefits to consumers or competition, and is an injury that consumers themselves could not reasonably have avoided. Defendant's conduct is unfair under each of these tests.

120.    As described above, Defendant's conduct violates the policies underlying privacy law, as well as COPPA.  The gravity of the harm of Defendant's secret tracking, profiling, and targeting of minors under the age of 13 is significant and there is no corresponding benefit to consumers of such conduct.  Finally, because Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class were completely unaware of Defendant's secret tracking, profiling and targeting, they could not have possibly avoided the harm.

121.    Under the UCL, a business practice that is likely to deceive an ordinary consumer constitutes a deceptive business practice.  Defendant's conduct was deceptive in numerous respects. Epic has intentionally and deceptively misled parents and the public about its collection and use of the Personal Information of minors under the age of 13 for the purpose of monetizing that information.  Epic consistently failed to properly monitor the age of its users or take any steps to safeguard the Personal Information of minors.  The belated and minor actions it took to permit parental controls, which were undertaken in part in response to internal pressure, were far too little, too late.  Fortnite's target audience

includes children under the age of 13, and Epic has been aware at all times that minors under the age of 13 access Fortnite.  Epic's knowledge of the widespread engagement of children under the age of 13 with its Fortnite franchise and its failure to disclose that it was tracking, profiling, and targeting such children without parental consent, while at the same time actively marketing products that were intended for an audience under the age of 13 are likely to and, in fact, did deceive Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class.  Defendant's conduct therefore constitutes deceptive business practices in violation of Cal. Bus. & Prof. Code § 17200.

122.    Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class were harmed by Defendant's violations of Cal. Bus. & Prof. Code § 17200.  Defendant's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class.

123.    Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's injuries are the direct and proximate result of Defendant's conduct described herein.

124.    Plaintiffs S.T.G., S.B.G., I.H., E.H., individually and on behalf of members of the California Class, seek: (1) injunctive relief, to the extent that the Permanent Injunction entered into between Defendant and the United States of America does not provide complete injunctive relief for the practices complained of herein, requiring Defendant to obtain consent prior to collecting Personal Information from children under the age of 13 and to delete the Personal Information already collected without parental consent, and to implement functionality sufficient to prevent unlawful collection and tracking in the future; (2) compensatory restitution of Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's money and property lost as a result of Defendant's acts of unfair competition; (3) disgorgement of Defendant's unjust gains; and (4) reasonable attorney's fees (pursuant to Cal. Code of Civ. Proc. § 1021.5).

## CLAIM THREE

### CALIFORNIA CONSTITUTIONAL RIGHT TO PRIVACY
### Cal. Const. Art. 1 § 1
### (On Behalf of Plaintiffs S.T.G., S.B.G., I.H., E.H., and the California Class)

125.    The foregoing allegations are re-alleged as if fully set forth herein.

126.    Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class have reasonable expectations of privacy in their electronic devices and their online behavior, generally.  Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's private affairs include their behavior on their electronic devices as well as any other behavior that may be monitored by the surreptitious tracking employed or otherwise enabled by Defendant.

127.    Defendant intentionally intruded on and into Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's solitude, seclusion, or private affairs by intentionally and surreptitiously obtaining, improperly gaining knowledge of, reviewing, and/or retaining Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's activities through the monitoring and tracking activities described herein.

128.    These intrusions are highly offensive to a reasonable person. This is evidenced by, *inter alia,* countless consumer surveys, academic and governmental studies, and op-eds decrying the online tracking of children, centuries of common law, state and federal statutes and regulations, legislative commentaries, enforcement actions undertaken by the FTC and Attorney General of the United States, industry standards and guidelines, and scholarly literature on consumers' reasonable expectations.

129.    Defendant's intrusion into the sacrosanct relationship between parent and child and subsequent commercial exploitation of children's special vulnerabilities online also contributes to the highly offensive nature of Defendant's activities.

130.   Defendant's conduct as aforesaid violated Plaintiffs S.T.G.'s, S.B.G.'s, I.H.'s, E.H.'s, and members of the California Class's right to privacy, as guaranteed by ART. I, § 1 of the California Constitution.

131.   Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class were harmed by the intrusion into their private affairs as detailed throughout this Complaint.  Defendant's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class.

132.   Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class therefore seek (1) injunctive relief, to the extent that the Permanent Injunction entered into between Defendant and the United States of America does not provide complete injunctive relief for the practices complained of herein, in the form of orders compelling Defendant's cessation of tracking and targeting practices in violation of state law and destruction of all personal data obtained in violation of state law; (2) compensatory and punitive damages in an amount to be determined at trial.  Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class seek punitive damages because Defendant's actions – which were malicious, oppressive, and willful – were calculated to injure Plaintiffs S.T.G., S.B.G., I.H., E.H., and members of the California Class and were made in conscious disregard of their rights. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

## CLAIM FOUR

### California Unjust Enrichment
### (On Behalf of Plaintiffs S.T.G., S.B.G., I.H., E.H., and the California Class)

133.   Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

134.   By virtue of the unlawful, unfair and deceptive conduct alleged herein, Defendant knowingly realized millions of dollars in revenue from the sale and use of the Personal Information of Plaintiffs and members of the California for advertising and related commercialization purposes.

135. This revenue was a benefit conferred upon Defendant by Plaintiffs and members of the California Class.

136. It would be inequitable and unjust to permit Defendant to retain the enormous financial benefits they have obtained at the expense of Plaintiffs and members of the California Class.

137. Defendant will be unjustly enriched if it is permitted to retain the financial benefits conferred upon them by Plaintiffs and members of the California Class through Defendant's unlawful, unfair, unauthorized, and impermissible use of the Personal Information of Plaintiffs and members of the California Class.

138. Plaintiffs and members of the California Class are therefore entitled to recover the amounts realized by Defendant at their expense.

139. Plaintiffs and members of the California Class are entitled to restitution, disgorgement, and/or the imposition of a constructive trust to recover the amount of Defendant's ill-gotten gains, and/or other sums as may be just and equitable.

## **CLAIM FIVE**

### **WASHINGTON CONSUMER PROTECTION ACT**
### **Wash. Rev. Code Ann. § 19.86.020, *et seq.***

### **(On behalf of Plaintiffs M.A., E.V.A. and the Washington Class)**

140. The foregoing allegations are re-alleged as if fully set forth herein.

141. Plaintiffs M.A., E.V.A. and members of the Washington Class are or were residents of Washington and/or viewed played Fortnite in Washington.

142. Wash. Rev. Code Ann. § 19.86.020 provides "[u]nfair methods of competition and unfair … acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

143. Wash. Rev. Code Ann. § 19.86.020 provides "[t]he courts be guided by final decisions of the federal courts and final orders of the [FTC] interpreting the various federal statutes dealing with the same or similar matters[.]"

144.    At all times mentioned herein, Defendants each engaged in "trade" or "commerce" in Washington in that they engaged in the advertising, offering for sale, sale, and distribution of property or any other articles, commodities, or things of value in Washington.

145.    Defendant violated Wash. Rev. Code Ann. § 19.86.020 by engaging in the unfair acts or practices proscribed by Wash. Rev. Code Ann. § 19.86.020 outlined herein.

146.    Defendant engaged in consumer-oriented acts through the offering, promoting, and/or distributing of YouTube and child-directed content hosted thereon, which significantly impacted the public because Fortnite is used by millions of Washington citizens, including Plaintiffs M.A., E.V.A. and members of the Washington Class.

147.    Defendants at all relevant times knowingly violated legal duties and public policy by unfairly and unlawfully collecting the Personal Information of children under 13 and tracking, profiling, and targeting those children with advertising and merchandise for Defendant's commercial financial gain.

148.    As outlined herein, Defendant at all times had actual knowledge of its own non-compliance with COPPA and other applicable privacy-related laws. Further, Defendant at all times had actual knowledge of their own collection of the Personal Information of Plaintiffs M.A., E.V.A. and members of the Washington Class, and the tracking, profiling, and targeting of those children for lucrative behavioral advertising and merchandise sales.

149.    As outlined herein, Defendant Epic intentionally designed Fortnite to, among other things, attract children under thirteen by making child-directed content available within Fortnite so that Defendant Epic could collect the Personal Information of those children under thirteen and target them with merchandise, advertising, and additional products for substantial commercial gain.

150.    The inherent characteristics, content, and features of Fortnite as designed by Defendant Epic, including the names, designs, cartoon elements, children's themes, and partnerships with

children's companies and brands, evince that Fortnite was and remains child-directed. That is, Fortnite was plainly intended for and meant to attract children under 13, collect the Personal Information of those children for purposes of exploiting that information for commercial gain via product sales, merchandise sales, and advertising.

151.    In particular, Defendant Epic systematically collected, used, and/or disclosed Personal Information from children under 13 in violation of COPPA, and therefore the FTC Act, to target them with merchandise, products, and advertising by, inter alia:

152.    Failing to provide sufficient notice of the information Defendant collected, or the information that was collected on Defendant's behalf, online from children under 13, how Defendant used such information, their disclosure practices, and all other required content, in violation of Section 312.4(d) of COPPA, 16 C.F.R. § 312.4(d);

153.    Failing to provide direct notice to parents of the information Defendants collected, or the information that was collected on Defendants' behalf, online from children under 13, how Defendants used such information, their disclosure practices, and all other required content, in violation of Section 312.4(b) and (c) of COPPA, 16 C.F.R. § 312.4(b)-(c);

154.    Failing to obtain verifiable parental consent before any collection or use of Personal Information from children under 13, in violation of Section 312.5 of COPPA, 16 C.F.R. § 312.5; and

155.    Failing to establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of Personal Information collected from children under 13, in violation of Section 312.8 of COPPA, 16 C.F.R. § 312.8.

156.    Violations of COPPA and the accompanying FTC regulations "shall be treated as a violation of a rule defining an unfair … act or practice prescribed under 15 U.S.C. § 57a(a)(1)(B)." 15 U.S.C. § 6502(c).  These rules define unfair acts or practices in or affecting commerce within the

meaning of 15 U.S.C. § 45(a)(1), which is the model for the various consumer protection statutes in the several states, including the Wash. Rev. Code Ann. § 19.86.020, et seq.[15]

157.    Accordingly, Defendant Epic engaged in unfair and unlawful trade acts or practices in violation of Wash. Rev. Code Ann. § 19.86.020, et seq., which is modeled after, proscribes the same conduct as, and gives deference to the definitions of the FTC Act.

158.    Defendant Epic's conduct is unfair, immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers, and there are no greater countervailing benefits to consumers or competition.  Plaintiffs M.A., E.V.A. and members of the Washington Class could not have reasonably avoided injury because Defendant took advantage of the lack of knowledge, ability, experience, and/or capacity of consumers—in this case children under 13—to their detriment.

159.    Defendant Epic willfully engaged in the unfair and unlawful acts described herein and knew or recklessly disregarded the fact that they violated Wash. Rev. Code Ann. § 19.86.020, et seq.

160.    Plaintiffs M.A., E.V.A. and members of the Washington Class were harmed by Defendant Epic's practices described herein, which were a substantial factor and caused injury in fact and actual damages to Plaintiffs M.A., E.V.A. and members of the Washington Class.

161.    As a direct and proximate result of Defendants' unfair and unlawful acts and practices in violation of Wash. Rev. Code Ann. § 19.86.020, et seq., Plaintiffs M.A., E.V.A. and members of the Washington Class have suffered and will continue to suffer an ascertainable loss of money or property, real or personal, and monetary and non-monetary damages, as described herein, including, inter alia, the loss of the value and/or diminishment in value of their Personal Information and the loss of the ability to control the use of their Personal Information.

---

[15] *See* 16 C.F.R. § 312.1 (COPPA "prohibits unfair or deceptive acts or practices in connection with the collection, use, and/or disclosure or personal information from and about children on the internet.").

162.   As outlined herein, there is tangible value in Plaintiffs M.A.'s, E.V.A.'s and members of the Washington Class's Personal Information. Plaintiffs M.A., E.V.A. and members of the Washington Class have lost the opportunity to receive value in exchange for their Personal Information.

163.   Defendant's monetization of Plaintiffs M.A., E.V.A. and members of the Washington Class Personal Information demonstrates that there is a market for their Personal Information.

164.   Plaintiffs M.A.'s, E.V.A.'s and members of the Washington Class's Personal Information is now in the possession of Defendants, who have used and will use it for their financial gain.

165.   Defendant's retention of the Personal Information of Plaintiffs M.A., E.V.A. and members of the Washington Class presents a continuing risk to them as well as the general public. Plaintiffs M.A., E.V.A. and members of the Washington Class seek relief for the injuries they have suffered as a result of Defendant's unfair and unlawful acts and practices, as provided by Wash. Rev. Code Ann. § 19.86.020, et seq. and applicable law, including all actual damages and attorneys' fees and costs, treble damages, statutory damages, and restitution, as well as an injunction requiring Defendant to each permanently delete, destroy or otherwise sequester the Personal Information collected without parental consent, requiring Defendant to provide a complete audit and accounting of the uses of the Personal Information by Defendant and any other third parties, and other appropriate injunctive and/or declaratory relief.

## CLAIM SIX

### WASHINGTON UNJUST ENRICHMENT
**(On Behalf of Plaintiffs M.A., E.V.A. and members of the Washington Class)**

166.   The foregoing allegations are re-alleged as if fully set forth herein.

167.   By virtue of the unlawful and unfair conduct alleged herein, Defendants each and in concert, through aid or assistance, or pursuant to a common purpose with the knowledge of the others, knowingly realized millions of dollars in revenue from the sale and/or use of the Personal Information of

Plaintiffs M.A., E.V.A. and members of the Washington Class for commercialization purposes, including merchandising and advertising.

168.    This Personal Information, the value of the Personal Information, and/or the attendant revenue, were monetary benefits conferred upon Defendant by Plaintiffs M.A., E.V.A. and members of the Washington Class.

169.    As a result of Defendant Epic's conduct, Plaintiffs M.A., E.V.A. and members of the Washington Class suffered actual damages in the loss of value of their Personal Information and the lost profits from the use of their Personal Information.

170.    It would be inequitable and unjust to permit Defendant Epic to retain the enormous economic benefits (financial and otherwise) they have obtained from and/or at the expense of Plaintiffs M.A., E.V.A. and members of the Washington Class.

171.    Defendant will be unjustly enriched if they are permitted to retain the economic benefits conferred upon them by Plaintiffs M.A., E.V.A. and members of the Washington Class through the collection, obtainment, and use of the Personal Information of Plaintiffs M.A., E.V.A. and members of the Washington Class and the value thereof.

172.    Plaintiffs M.A., E.V.A. and members of the Washington Class are therefore entitled to recover the amounts realized by Defendant at the expense of Plaintiffs M.A., E.V.A. and members of the Washington Class.

173.    Plaintiffs M.A., E.V.A. and members of the Washington Class have no adequate remedy at law. They are entitled to restitution, disgorgement, and/or the imposition of a constructive trust to the recover the amount of Defendant's ill-gotten gains, and/or other sums as may be just and equitable.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of themselves and the proposed Classes, respectfully request relief as follows:

A.   An order certifying this action as a class action, and certifying the Classes defined herein, designating Plaintiffs, as described above, as the representatives of the respective Classes defined herein, and appointing Plaintiffs' counsel as counsel for the Classes;

B.   An order declaring that Defendant's actions, as described above constitute: (i) breaches of the common law claim of intrusion upon seclusion as to the intrusion upon seclusion claims set forth above; (ii) violations of the state consumer protection statutes set forth above; (iii) a violation of the right to privacy under the California Constitution, Article I, Section 1; and (iv) that Defendant Epic was unjustly enriched as a result of their actions.

C.   A judgment awarding Plaintiffs and the members of the Classes appropriate relief, including actual, compensatory, and/or statutory damages, and punitive damages (as permitted by law), in an amount to be determined at trial;

D.   A judgment awarding any and all equitable, injunctive, and declaratory relief as may be appropriate, including orders of disgorgement of Defendant's unlawful gains, and restitution.

E.   A judgment awarding all costs, including experts' fees, attorneys' fees, and the costs of prosecuting this action, and other relief as permitted by law;

F.   Pre-judgment and post-judgment interest, as permitted by law; and

G.   Grant such other legal and equitable relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable.

DATED: March 18, 2024

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

  _/s/ Mark Todzo_
Patrick Carey, (Bar No. 30862)
Mark Todzo, (Bar No. 168389)
**LEXINGTON LAW GROUP, LLP**
503 Divisadero Street
San Francisco, California 94105
Telephone: (415) 913-7800
pcarey@lexlawgroup.com
mtodzo@lexlawgroup.com

Ian W. Sloss
Jennifer Sclar
Johnathan Seredynski
Krystyna Gancoss
Kate Sayed
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Fax: (203) 325-3769
isloss@sgtlaw.com
jsclar@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com
ksayed@sgtlaw.com

CLASS ACTION COMPLAINT